**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **THIERRY B., et al.,** | **Civil Action No.  20-4035(MCA)** |
| **Petitioners,** | |
| **v.** | **OPINION** |
| **THOMAS DECKER, et. al,** | |
| **Respondents.** | |

**ARLEO, UNITED STATES DISTRICT JUDGE**

Petitioners Thierry B.,  Michael C., Amr. A.E., Jose L.H., Nathaniel L., Naishel S., and Oscar J.P. are individuals in the custody of the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE") and are detained at Hudson County Correctional Center ("HCCC") in New Jersey during their removal proceedings.  This matter was initially filed in the Southern District of New York, and transferred to this District.  *See* ECF Nos. 1, 10.  On April 18, 2020,  Petitioners filed an Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241 and an Emergency Motion for Temporary Restraining Order ("TRO") under Federal Rule of Civil Procedure 65, requesting the Court order their immediate release from detention based on their vulnerability to complications or death if they contract the novel coronavirus disease 2019 ("COVID-19").   ECF Nos. 20 ("Amended Petition") & 21 ("TRO Motion").  Respondents oppose the Motion.  ECF No. 22.  The Court has reviewed the Amended Petition and the parties' submissions, including their supplemental submissions, and has examined the applicable law.  At this time, the Court will reserve judgment as to Amr. A.E., and deny without prejudice the remaining requests for immediate release for the reasons stated in this Opinion.

## I.   FACTUAL BACKGROUND

### A. Petitioners' Immigration Proceedings and Relevant Criminal Histories

#### 1.   Thierry B.

Petitioner Thierry B. is a 39-year-old father who has lived in the United States since 2010. Am. Petition ¶ 6.  He is a native of Guadeloupe and citizen of France and entered the United States at New York, New York on or about September 12, 2010, as a non-immigrant pursuant to the Visa Waiver Program, with authorization to remain in the United States until December 11, 2010. Declaration of Jason Mascia ("Mascia Decl.") ¶ 4(a); *see also* Am. Petition ¶ 6.  He remained in the United States beyond that date without authorization from DHS.  *Id.*

On August 23, 2019, Thierry B. was arrested in New York for the crimes of Criminal Sexual Act in the 1st Degree under N.Y. Penal Law § 130.50(3); Sexual Abuse in the 1st Degree, under N.Y. Penal Law § 130.65(4); Endangering the Welfare of a Child, under N.Y. Penal Law § 260.10(1).  Mascia Decl. ¶ 4(a); Ex. 1 at 10-11, 14, 20-21.   On November 20, 2019, he was arraigned on the following charges: Criminal Sexual Act in the 1st Degree, under N.Y. Penal Law § 130.50(3); two counts of Sexual Abuse in the 1st Degree, under N.Y. Penal Law § 130.65(3); two counts of Sexual Abuse in the 2nd Degree, under N.Y. Penal Law § 130.60(2); Sexual Misconduct, under N.Y. Penal Law § 130.20(2); Forcible Touching, under N.Y. Penal Law § 130.52(1); and Endangering the Welfare of a Child, under N.Y. Penal Law § 260.10(1). Mascia Decl. ¶ 4(a); Ex.1 at 12, 15-19 21.  Those charges remain pending. Mascia Decl. ¶ 4(a), and are based on allegations that Thierry B. requested and received oral sex from the victim, a then-five-year old child.  *See* Ex 1 at 15-22.

Thierry B. was taken into ICE custody on January 25, 2020, served with a Notice to Appear ("NTA"), and placed in removal proceedings.  Mascia Decl. ¶ 4(a); Ex. 1 at 3-5.  At a bond hearing

held on April 13, 2020, the immigration judge denied bond, finding that he was a danger to the community.  Mascia Decl. ¶ 4(a); Ex. 1 at 1.  His counsel reserved appeal of that decision.  *Id.*  His immigration proceedings remain pending at the Varick immigration court in New York City ("Varick"), and he is currently detained pursuant to Section 236(a) of the Immigration and Nationality Act ("INA").  Mascia Decl. ¶ 4(a); Ex. 1 at 2.

### 2.  Michael C.

Michael C. is a 37-year-old lawful permanent resident and father of three U.S. citizen children.  Am. Petition ¶ 7.  He is a native and citizen of the Philippines and entered the United States at New York, New York, as a lawful permanent resident, on or about July 1, 1996.  Mascia Decl. ¶ 4(b); Ex. 2 at 3.

On May 5, 2016, following the search of his residence, law enforcement recovered several loaded weapons and ammunition hidden in the residence and a quantity of cocaine and crack cocaine, along with items used to package narcotics.  *See* Ex. 2 at 12-13.  On October 30, 2017, he was convicted of Criminal Possession of a Controlled Substance in the 4th Degree, under N.Y. Penal Law § 220.09(1) (Cocaine) and Attempted Criminal Possession of a Weapon in the 2nd Degree, under N.Y. Penal Law § 110-265.03(1B) (handgun) and was sentenced to one year in prison.  Mascia Decl. ¶ 4(b); Ex. 2 at 4, 5-12.

On November 29, 2019, Michael C. was taken into ICE custody.  Mascia Decl. ¶ 4(b); Ex. 2 at 21.  He is subject to mandatory detention under Section 236(c) of the INA.  Mascia Decl. ¶ 4(b); Ex. 2 at 18-19.  He was served with an NTA on December 3, 2019, and placed in removal proceedings.  Mascia Decl. ¶ 4(b); Ex. 2 at 14-17.  An immigration judge denied his motion to terminate proceedings and sustained the charge of removability on the NTA on February 27, 2020.  Mascia Decl. ¶ 4(b).  His immigration proceedings remain pending at Varick.  *Id*; Ex. 2 at 13.

### 3.  Amr. A. E.

Amr A. E., is a 40-year-old father of three, Am. Petition ¶ 8, and a native and citizen of Egypt who entered the United States at New York, New York, on a B2 nonimmigrant visa on July 18, 2000, with authorization to remain until January 17, 2001.  Mascia Decl. ¶ 4(c); Ex. 3 at 1.  He remained in the United States beyond that date without authorization from DHS.  *Id.*

On April 23, 2003, he was convicted of Burglary in the 3rd Degree: Illegal Entry with Intent to Commit a Crime, under N.Y. Penal Law § 140.20.  Mascia Decl. ¶ 4(c); Ex. 3 at 11, 22. On October 22, 2002, he was also convicted of Possession of Forged Instrument in the 3rd Degree, under N.Y. Penal Law § 170.20.  Mascia Decl. 4(c); Ex. 3 at 13.  On September 4, 2019, he was arrested for Assault in the 3rd Degree, under N.Y. Penal Law § 120.00(1) and Endangering the Welfare of a Child, under N.Y. Penal Law § 260.10(1). Mascia Decl. ¶ 4(c), and on September 25, 2019, his charges for assault and endangering the welfare of a child were dismissed, and he pleaded guilty to disorderly conduct under N.Y. Penal Law § 240.20(7).  *Id.*[1]  There is no further information about the nature of the recent assault and endangering charges.  On January 31, 2020, he also pleaded guilty to petit larceny under N.Y. Penal Law § 155.25, and obstruction of government administration in the 2nd degree under N.Y. Penal  Law § 195.05.

On September 27, 2019, he was taken into ICE custody, served with a Notice to Appear, and placed in removal proceedings.  Mascia Decl. ¶ 4(c); Ex. 3 at 1-2.  On January 30, 2020, an immigration judge granted him voluntary departure under safeguards.  Mascia Decl. ¶ 4(c); Ex. 3 at 24-25.  According to ICE, he failed comply with the conditions of voluntary departure, and now

---

[1] This information about Petitioner's 2019 arrest and conviction is not in Petitioner's Rap Sheet and is contained only in the Mascia Declaration; Petitioner, however, does not appear to dispute this part of his criminal history in the Reply.

has a final Order of Removal, and no appeal is pending.  *Id.*  According to Petitioner, he wishes to be removed to Egypt immediately, but ICE continues to hold him in detention.  Am. Petition ¶ 8.

### 4.  Jose L. H.

Jose L.H. is a forty-six-year-old single father to two U.S. citizen children who has lived in the United States since he was a teenager and has consistently maintained his Temporary Protected Status from El Salvador until he was placed into removal proceedings.  Am. Petition ¶ 9.  He entered the United States at an unknown place on an unknown date, without inspection by an immigration officer.  Mascia Decl. ¶ 4(d).

On December 19, 2018, Jose L.H. was convicted on two counts of assault in the 2nd degree: intent to cause physical injury with weapon/instrument under N.Y. Penal Law § 120.05(2), and two counts of endangering the welfare of a child under N.Y. Penal Law § 260.10(1).  Mascia Decl. ¶ 4(d); Ex. 4.  Jose L.H was sentenced to 5 years of probation on the assault charges and three years of probation on the endangering charges, and his juvenile victims each received an eight-year order of protection.[2]  Mascia Decl. ¶ 4(d); Ex. 4 at 18.  According to police reports, Jose L.H. used a belt to repeatedly strike a twelve-year-old boy and an eleven-year-old girl on separate occasions, and both children sustained significant injuries that required treatment at the hospital emergency room.  *See* Ex. 4 at 13-14.

On May 1, 2019, he was taken into ICE custody, served with an NTA, and placed in removal proceedings; on October 30, 2019, an immigration judge ordered him removed, and his appeal of that decision is pending at the Board of Immigration Appeals ("BIA"). Mascia Decl.  ¶ 4(d); Ex. 4 at 1.  He is subject to mandatory detention pursuant to Section 236(c) INA, Mascia Decl. ¶ 4(d); Ex. 4 at 3-5.

---

[2] On October 27, 2006, Jose L.H. pled guilty to harassment under N.Y. Penal Law § 240.26(1). Id., Ex. 4 at 9.

### 5. Nathaniel L.

Nathaniel L. is a twenty-eight-year-old father, Am. Petition ¶ 10, and is a native and citizen of Jamaica and entered the United States at New York, New York on a B2 nonimmigrant visa on July 17, 2012, with authorization to remain until January 16, 2013.  Mascia Decl. ¶ 4(e).  He remained in the United States beyond that date without authorization from DHS.  *Id.*

On April 15, 2019, Nathaniel L. was arrested for Robbery in the 2nd Degree Causes Physical Injury, in violation of N.Y. Penal Law § 160.10(2A); Strangulation in the 1st Degree Obstructing Breath/Blood Circulation, in violation of N.Y. Penal Law § 121.13; and Assault in the 3rd Degree in violation of N.Y. Penal Law § 120.00. Mascia Decl. ¶ 4(e); Ex. 5 at 4.  These charges remain pending.  Mascia Decl. ¶ 4(e).

On March 6, 2020, he was taken into ICE custody and served with an NTA.  Mascia Decl. ¶ 4(e).  He is detained pursuant to Section 236(a) of the INA, and his immigration proceedings remain pending at Varick.  *Id.*

### 6. Naishel S.

Naishel S. is a 22-year-old lawful permanent resident who came to the United States when he was 13.  Am. Petition ¶ 11.  He is a native and citizen of the Netherlands Antilles and entered the United States under the Visa Waiver Program on April 5, 2011.  Mascia Decl. ¶ 4(f); Ex. 6 at 47.

On June 12, 2018, Sophia was convicted of two counts of Criminal Sale of a Controlled Substance in the 3rd Degree, in violation of N.Y. Penal Law § 220.39(1) (Cocaine), Mascia Decl. ¶ 4(f); Ex. 6 at 6-11, 17, 47, and sentenced to one year in prison.  *See* Ex. 6 at 19.  On July 17, 2019, Sophia was convicted of Attempted Burglary in the 2nd Degree, in violation of N.Y. Penal Law § 110-140.25(2).  Mascia Decl. ¶ 4(f); Ex. 6 at 26, 27-35.  The latter criminal conviction

stems from Naishel S.'s participation in a series of attempted burglaries in Queens with several codefendants, and property was stolen from at least one residence.  *See* Ex. 6 at 31-36.[3]

Naishel S. was taken into ICE custody on July 17, 2019, and served with a NTA.  Mascia Decl. ¶ 4(f).  A second NTA that superseded the first was issued on August 20, 2019. Mascia Decl. ¶ 4(f); Ex. 6 at 45-47.  On August 22, 2019, an immigration judge ordered him removed. Mascia Decl. ¶ 4(f); Ex. 6 at 43-44.  On August 23, 2019, he filed a motion to reopen, which was granted. Mascia Decl. ¶ 4(f); Ex. 6 at 2, 38.  On December 2, 2019, an immigration judge again ordered Petitioner removed. Mascia Decl. ¶ 4(f); Ex. 6 at 40-42.  He appealed this decision to the BIA on December 6, 2019, and that appeal remains pending.  Mascia Decl. ¶ 4(f).

Naishel S. also filed a habeas petition in the Southern District of New York: *Sophia v. Decker*, Civ. No 19-9599 (LGS) (S.D.N.Y.).  On February 14, 2020, Judge Schofield granted the petition and ordered a bond hearing. Mascia Decl. ¶ 4(f); Ex. 6 at 3.  The bond hearing was held on March 5, 2020; he was denied bond because the immigration judge concluded that ICE demonstrated he presented a danger to the community.  Mascia Decl. ¶ 4(f).  He is subject to mandatory detention pursuant to Section 236(c) INA.  *Id.*

### 7.  Oscar J.P.

Oscar J. P., is the father of five U.S citizen children, and has resided in the United State for approximately 15 years.  Am. Petition ¶ 12.  He is a native and citizen of El Salvador and entered the United States at an unknown place on an unknown date, without inspection by an immigration officer.  Mascia Decl. ¶ 4(g); Ex. 7 at 2.

On June 21, 2018, he was convicted of Disorderly Conduct, under N.Y. Penal Law § 240.20(7).  Mascia Decl. ¶ 4(g); Ex. 7 at 10-13, 24-25, 27-28.  On March 18, 2019, Oscar J.P. was

---

[3] Naishel S.'s rap sheet also shows that he has a juvenile criminal history, which is not recounted here.

convicted of one count of Criminal Obstruction of Breathing or Blood Circulation Apply Pressure, under N.Y. Penal Law § 121.11(a) and Endangering the Welfare of a Child, under N.Y. Penal Law § 260.10(1). Mascia Decl. ¶ 4(g); Ex. 7 at 13-15, 20-21.

On December 2, 2019, Oscar J.P. was taken into ICE custody, served with a Notice to Appear, and placed in removal proceedings. Mascia Decl. ¶ 4(g); Ex. 7 at 1-6.  On February 27, 2020, an immigration judge denied his request for bond, finding him to be a danger to the community.  Mascia Decl. ¶ 4(g).  His immigration proceedings remain pending at Varick, and he is detained pursuant to Section 236(a) of the INA.  Mascia Decl. ¶ 4(g); Ex. 7 at 6.

### B.  The COVID-19 Health Crisis

On March 11, 2020, the World Health Organization classified COVID-19 as a global pandemic, anticipating that "the number of cases, the number of deaths, and the number of affected countries" would increase.[4]  Around that time, the United States had reported only approximately 1,000 cases of COVID-19.[5]  As of June 4, 2020, that number has risen to over 1.8 million and the virus has taken 107,728 lives nationally.[6]  New York and New Jersey have the greatest number of infections and deaths in the nation, with New Jersey reporting a total of 162,530 cases and 11,970 deaths as of June 4, 2020.[7]  Hudson County, where Petitioners are detained, currently has the most COVID-19 cases in the state at 18,465 and has 1,199 deaths as of June 4, 2020.[8]

---

[4] World Health Org., *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – March 2020* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[5] *Coronavirus Case Total Climbs in New York*, THE NEW YORK TIMES (Mar. 11, 2020) https://www.nytimes.com/2020/03/11/nyregion/coronavirus-new-york-update.html.

[6] *Coronavirus in the U.S.: Latest Map and Case Count,* THE NEW YORK TIMES, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html, (last visited Jun. 4, 2020).

[7] *New Jersey Coronavirus Map and Case Count*, THE NEW YORK TIMES, https://www.nytimes.com/interactive/2020/us/new-jersey-coronavirus-cases.html, (last visited Jun. 4, 2020).

[8] *Id.*, https://www.nytimes.com/interactive/2020/us/new-jersey-coronavirus-cases.html#county (last visited Jun. 4, 2020).

According to the Centers for Disease Control and Prevention (the "CDC"), COVID-19 spreads "mainly from person-to-person" between those "who are in close contact with one another (within about 6 feet)" and possibly when people touch contaminated surfaces and then touch their mouths, noses, or eyes.[9]   The most common symptoms of COVID-19 include fever, cough, and shortness of breath.[10]

Experts still have much to learn about how the virus spreads.  In early April, the CDC director, Dr. Robert Redfield, in an interview with National Public Radio affiliate WABE, stated that "a significant number of individuals that are infected actually remain asymptomatic.  That may be as many as 25 percent[,]" and this is important because asymptomatic individuals contribute to the transmission of the virus.[11]   Furthermore, those who become symptomatic can likely transmit the virus up to 48 hours before they show symptoms.[12]   These asymptomatic transmitters and individuals who are transmitting the virus before they become symptomatic help explain how rapidly the virus can spread.[13]

Symptoms of COVID-19 can be mild, and "[a]nyone can have mild to severe symptoms."[14] But certain individuals are at higher risk for severe illness or death if they contract COVID-19.

---

[9] Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited May 27, 2020).

[10] *Id.*; Ctrs. for Disease Control and Prevention, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited May 27, 2020).

[11] *CDC Director On Models For The Months To Come: 'This Virus Is Going To Be With Us'*, NPR, https://www.npr.org/sections/health-shots/2020/03/31/824155179/cdc-director-on-models-for-the-months-to-come-this-virus-is-going-to-be-with-us; *see also* Apoora Mandavilli, Infected but Feeling Fine: The Unwitting Corona-virus Spreaders, N.Y. Times (Mar. 31, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

[12] *Id.*

[13] *Id.* The CDC also states in its guidance that "[s]ome recent studies have suggested that COVID-19 may be spread by people who are not showing symptoms."  Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html  (last visited May 27, 2020).

[14] Ctrs. For Disease Control and Prevention, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited June 4, 2020).

Among them are persons who are "65 and older," those in nursing homes or long-term care facilities, and people of all ages who are immunocompromised, or who have underlying health issues like asthma, chronic lung disease, HIV, heart conditions, diabetes, chronic kidney disease or liver disease, and severe obesity ("CDC Risk Factors").[15]   There is presently no vaccine to prevent COVID-19 infections.[16]   The CDC and health experts thus emphasize the importance of "social distancing" (i.e. staying at least six feet apart), regularly disinfecting "high touch" surfaces, and wearing cloth face covering to curtail the spread of the virus.[17]   Ultimately, "[t]he best way to prevent illness is to avoid being exposed to this virus."[18]

But in truth, avoiding exposure to COVID-19 is impossible for most detainees and inmates in correctional facilities, and detainees who meet the CDC's criteria for "higher risk" are the most vulnerable to a detention facility's shortcomings.   In its guidance for correctional facilities, the CDC has explained that, among other things, the crowded and fluid nature of detention facilities, the inadequate hygienic supplies, and the limited options for medical isolation present "unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors."   *See* ECF No. 40-1, CDC March 2020 Interim Guidance ("CDC Interim Guidance") at 2.   Consequently, practicing social distancing and ensuring proper hygiene to minimize the risk of infection are exceedingly difficult. Consequently, the CDC Interim Guidance recommends extensive testing, cleaning and quarantining procedures to contain the spread of infection.   *Id.*

---

[15]   Ctrs. for Disease Control and Prevention, *People Who Are at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited May 27, 2020).

[16]   Ctrs. for Disease Control and Prevention, *Prevent Getting Sick*,  https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/index.html (last visited May 27, 2020).

[17]   Ctrs. for Disease Control and Prevention, *supra* note 8.

[18]   *Id.*

Against this backdrop, Petitioners assert that they have chronic physical and mental health conditions that increase their risk of serious complications or even death if they were to contract COVID-19 and that the measures taken by HCCC are insufficient to protect them from harm.

### C.  Petitioners' Chronic Medical & Mental Health Conditions

#### 1.  Thierry B.

Thierry B. suffers from chronic hypertension (i.e. high blood pressure).  Am. Petition ¶ 6. He requires regular medication, including Amlodipine and Hydrochlorothiazide, to manage his blood pressure.  *Id.* ¶ 69; *see also* ECF No. 23-2, Excerpted Medical Records at 6, 9.  Petitioners assert that Thierry B., faces an increased risk of severe illness or death if he were to contract COVID-19, *see id.*, and cite to a study examining COVID-19 hospital admissions in 14 states during the month of March, where the CDC found that hypertension was the most common underlying health problem for those hospitalized, with 49.7% of patients suffering from this condition.[19] *See* ECF No. 21, TRO Motion at 9.  Furthermore, in Italy, 76% of people who died from coronavirus had high blood pressure,[20] and in in Wuhan, China, where the outbreak began, a top coronavirus doctor indicated that "nearly half" of those who perished from the virus suffered from hypertension.[21]

---

[19] Ctrs. for Disease Control and Prevention, *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 — COVID-NET, 14 States, March 1–30, 2020,* (Apr. 17, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm?s_cid=mm6915e3_w  (hereinafter, "CDC Hospitalization Study").

[20] *Coronavirus and High Blood Pressure: What's the Link?*, Web Md, https://www.webmd.com/lung/coronavirus-high-blood-pressure#1 (last visited June 8, 2020).

[21] *Top Coronavirus Doctor in Wuhan Says High Blood Pressure is a Major Death Risk* (Mar. 9, 2020), Bloomberg.com, https://www.bloomberg.com/news/articles/2020-03-09/top-virus-doctor-says-high-blood-pressure-is-major-death-risk

### 2. Amr. A.E.

Amr A.E. suffers from severe obesity, Am. Petition ¶ 8, and has a history of heavy smoking; records indicate that he no longer smokes but smoked a pack of cigarettes a day for 15 years, *see* ECF No. 25-1 at 1, Medical Records of Amr. A.E.  He also described bouts of dizziness and difficulty breathing.  *See* Am. Petition ¶ 75.  Severe Obesity is listed among the underlying conditions that place people at risk for severe illness from coronavirus.[22]  Petitioners emphasize the WHO statement that "available evidence suggests that smoking is associated with increased severity of disease and death in hospitalized COVID-19 patients."[23]

### 3. Michael C.

Michael C. suffers from obesity, albeit not severe, and also has a history of smoking and relies on methadone treatment.[24]  Am. Petition ¶ 7; *see also* Excerpted Medical Records at 20.  In addition to the risks associated with smoking, as described above, Petitioners emphasize that obesity, even if not severe, is associated with decreased respiratory capacity and functionality, in addition to contributing to complications with ventilation.[25]  Not only do obesity-related conditions, like heart disease and diabetes, worsen the effects of COVID-19, but even

---

[22] *See supra* n.15, CDC Risk Factors.

[23] Smoking and COVID-19: Scientific Belief, The World Health Organization (May 26, 2020), https://www.who.int/news-room/commentaries/detail/smoking-and-covid-. The WHO did qualify these findings by stating that "no evidence to quantify the risk to smokers of hospitalization with COVID-19 or of infection by SARS-CoV-2 was found in the peer-reviewed literature" and "[p]opulation-based studies are needed to address these questions." *Id.*

[24] Petitioners also assert that the lockdown regime at Hudson present a high risk of interruption of Michael C.'s methadone treatment.  *Id.*

[25] William Dietz and Carlos Santos-Burgoa, *Obesity and its Implications for COVID-19 Mortality*, Obesity (Apr. 1, 2020), https://onlinelibrary.wiley.com/doi/10.1002/oby.22818 ("Obesity is associated with decreased expiratory reserve volume, functional capacity and respiratory system compliance. In patients with increased abdominal obesity, pulmonary function is further compromised in supine patients by decreased diaphragmatic excursion, making ventilation more difficult. Furthermore, increased inflammatory cytokines associated with obesity may contribute to the increased morbidity associated with obesity in COVID-19 infections.")

metabolically-healthy obese patients may be at greater risk due to a decreased immune system[26] and increased level of an enzyme that binds well to coronaviruses.[27] In the CDC Hospitalization Study, obesity was the second-most common underlying health condition, following hypertension, with 48.3% of hospitalized patients suffering from this condition.[28]

### 4.  Nathaniel A.L.

Nathaniel A.L. has a history of asthma, *see* Excerpted Medical Records at 23-24, and has smoked since adolescence.  *Id.* ¶ 10.   Petitioners argue that in addition to his increased risk of complications as a smoker, Nathaniel A.L. faces increased risk of complications due to his history of asthma, as the CDC advises that persons with moderate to severe asthma are at high risk for severe illness from COVID-19.[29]  The Petitioners further note that the CDC Hospitalization Study indicated that chronic lung disease—primarily asthma—was the third-most common underlying condition among adult patients hospitalized with COVID-19 (34.6%), following hypertension and obesity.[30]

### 5.  Naishel S.

Naishel S. recently collapsed on the floor of the HCCC and had to be taken to the doctor because he was having trouble breathing.  Am. Petition ¶ 11.  Petitioners assert that his recent

---

[26] Rami Bailonym MD, *Americans Unfit to Fight a Pandemic: Epidemics of obesity, sedentary habits, and chronic stress leave nation with poor baseline health*, MedPage Today (Mar. 23, 2020), https://www.medpagetoday.com/infectiousdisease/covid19/85553  ("Obesity has been well documented to increase one's risk of respiratory infections and more importantly increases the severity of those infections.")

[27] *See* Lisa Jaffe and Karl Nadolsky DO, *COVID-19 and Obesity: How to prepare for the Coronavirus with obesity*, endocrineweb.com (Apr. 2, 2020) https://www.endocrineweb.com/conditions/obesity/covid-19-obesity (explaining that obesity may correlate with angiotensin-converting enzyme 2, or ACE2, which is known to bind well with the SARS coronavirus).

[28] *See, supra,* n.19, CDC Hospitalization Study.

[29] *See, supra,* n.15, CDC Risk Factors.

[30] *See, supra,* n.19, CDC Hospitalization Study.

collapse and breathing difficulties raise his risk of complications were he to contract COVID-19.[31] On March 3, 2020, Rossanna Echegoyen, LSCW, also determined that Petitioner meets the criteria for posttraumatic stress disorder ("PTSD") as a result of a beating by correctional officers at Riker Island in 2018. *See* Excerpted Medical Records at 36-41.

### 6. **Jose L.H.**

Jose L.H. suffers from severe psoriasis and anxiety, Am. Petition ¶ 9, Excerpted Medical Records at 32, and was recently diagnosed with Latent Tuberculosis ("Latent TB"). *See* ECF No. 24-1, Excerpted Medical Records of Jose L.H. Tuberculosis is a bacterial infection that most frequently attacks the lungs.[32] On March 10, 2020 he was started on treatment for Latent TB. *See id.* at 13-14, 22-24. As explained in the supplemental letter by Dr. "Gina" Hoai-nam Hoang, MD ("Dr. Hoang"), "[t]here is preliminary evidence that latent and active tuberculosis may be correlated with increased susceptibility to COVID-19 as well as increased severity." *See* ECF No. 24-2, Supp. Letter of Dr. Hoang.

Jose L.H. also suffers from severe psoriasis, which is an autoimmune disease that arises when "the body's own immune system becomes overactive and attacks normal tissues in the body."[33] He has plaque psoriasis with fifteen percent of his skin affected, with severe psoriasis

---

[31]Petitioners cite to a recent study from the United Kingdom, which found that "[p]atients with existing illnesses that cause breathlessness, wheezing or lung problems run a higher risk of developing severe cases of COVID-19 infection due to the new coronavirus," and "[p]atients with shortness of breath [are] 3.7 times more likely to have severe COVID-19 disease and 6.6 times more likely to need intensive care than those without." Kate Kelland, *Patients with breathing, lung problems at highest risk with COVID-19 - study*, Reuters (Mar. 18, 2020), https://www.reuters.com/article/us-health-coronavirus-breathing/patients-with-breathing-lung-problems-at-highest-risk-with-covid-19-study-idUSKBN2153ED. The researchers found however that "[a] condition known as chronic obstructive pulmonary disease, or COPD, - a chronic progressive lung disease that causes long-term breathing problems - is the greatest risk factor for severe COVID-19 among hospitalized patients," *see id*, and none of the Petitioners in this action have COPD.

[32] Ctrs. For Disease Control and Prevention, *Basic TB Facts* (last updated Mar. 20, 2016) https://www.cdc.gov/tb/topic/basics/default.htm, last visited May 30, 2020.

[33] Centers for Disease Control and Prevention, *What is psoriasis?*, https://www.cdc.gov/psoriasis/index.htm, last visited May 29, 2020.

defined as greater than ten percent of the skin affected.  Supp. Letter of Dr. Hoang at 1.  Jose L.H.'s psoriasis is so severe that doctors at University Hospital have discussed systemic treatments with immunosuppressant medications that may be his only means of treating his psoriasis.  *See* Supplemental Medical Records of Jose L.H. at 26-27.  Dr. Hoang opines that due to his current treatment for latent TB, Jose L.H. is "unable to start an immunosuppressive or biologic medication to treat his severe psoriasis and possible psoriatic arthritis until he completes his treatment for latent tuberculosis." Supp. Letter Dr. Hoang at 1.  Dr. Hoang further opines that once treatment ends, his heightened risk of exposure to COVID-19 in a jail setting, as well as his being high risk for complications if he contracts COVID-19, would likely further delay any such efforts to treat his psoriasis.  *Id.*

### 7. Oscar J.P.

Oscar J.P. has a history of smoking and has experienced significant chest pains and heart palpitations.  Amended Pet. ¶ 12.  Petitioners assert that his extensive history of smoking increases his risk of complications if he were to contract COVID-19.   Petitioners medical records substantiate his recent history of heart palpitations and show that bloodwork performed in April 2020 revealed abnormalities in his liver enzymes, specifically elevated levels of transaminases. *See* ECF No. 27-1, Excerpted Medical Records of Oscar P at 13 (reporting rapid heart rate on April 15, 2020); *id.* at 10 (bloodwork indicating elevated levels of AST (SGOT) and ALT (SGPT)).[34] *Id.*

---

[34] Medical Expert Dr. Sara Anne Fleming ("Dr. Fleming") opines that Oscar J.P. "may have liver disease, which needs further evaluation", including repeated lab work and follow up.  *See* ECF No. 27-2 at 1, Letter from Dr. Fleming.  Dr. Fleming also opines that he needs follow up treatment to evaluate his tachycardia, including an EKG. *Id.*

### 8.   HCCC's COVID-19 Management & Prevention Protocols

HCCC asserts that it has taken sufficient precautions to mitigate the risk of COVID-19 exposure arising from external and internal influences, and has provided its most updated protocols in the Sixth Amended Declaration of Ronald Edwards.  *See* ECF No. 26-1, Edwards Decl.

To reduce the population of inmates and detainees, HCCC is operating at a reduced capacity.[35]  *See* Edward Decl. ¶ 3.  HCCC is still accepting ICE detainees, however, albeit with exceptions, and detainees, inmates, vendors, and staff are subject to medical evaluations before entering the Facility.  Edwards Decl. ¶¶ 12.B.i., 12.B.ii., 12.B.vii, 12.C.  HCCC has suspended all social visitations and tours, and only "no-contact" visits and telephone conferences are permitted with attorneys.  Edwards Decl. ¶¶ 12.D.i, 12.H.-J.

In addition to its efforts at preventing exposure from external factors, HCCC has taken affirmative steps to lessen the risk of COVID-19 exposure and transmission within the jail. HCCC has implemented a "[r]estrictive schedule," permitting one "tier . . . out in the morning and the other portion . . . out in the afternoon, rotating daily."[36]  Edwards Decl. ¶ 11.  As a social distancing measure, beginning on March 21, 2020, the "recreation period" is now staggered to permit only two "inmates/detainees" to leave their cells for a thirty-minute recreational-use period. *Id.* ¶ 12.K.  Detainees have meals inside their cells to prevent congregation.  *See id.* ¶¶ 12.E, 13.E.

With respect to cleaning and hygiene, HCCC "lock[s] down" each housing unit in between shifts for cleaning and sanitization, which occurs, at a minimum, three times per day.  *See id.*  ¶¶ 11, 12.E.  Warden Edwards also states that staff clean the recreation areas "constantly" each day,

---

[35] During the first three months of this year, HCCC housed on average 600 inmates and 300 ICE detainees per day.  As of May 11, 2020, HCCC's current inmate and detainee population is 682 of which 122 are ICE detainees.  *Id.*

[36] By way of background, ICE detainees are housed in their own housing units separately from federal and state inmates, and, according to the protocol, ICE detainees do not come into contact with inmates within the facility, and there are separate correctional staff assigned to the ICE detainees.  *Id.* ¶ 4.

*id.* ¶ 12.K, but he does not state when, how often, and what that cleaning entails.  The protocol for providing cleaning supplies to inmates and detainees is somewhat unclear; the protocol states that "inmates and detainees <u>may request</u> disinfectant wipes from staff." *Id.* ¶ 11, but later states that "inmates and detainees <u>are provided</u> disinfectant wipes, along with two bars of soap and unlimited water. *Id.* ¶ 19.

Confirmed cases of COVID-19 that do not require hospitalization are isolated in a designated area.  Edwards Decl. ¶ 15.  Symptomatic inmates or detainees who are awaiting test results are quarantined.  Ahrendt Decl. ¶ 9.H.  Finally, those who are asymptomatic but "have had a known exposure" to a confirmed COVID-19 case are "cohorted" together with restrictive movement for fourteen-day period.  Ahrendt Decl. ¶ 9.I.  Cohorting ends if no new COVID-19 case develops within that period.  *Id.*

HCCC has an on-site physician who is on-call 24/7 for emergencies.  Edwards Decl. ¶ 7.  Detainees and inmates at the Facilities are permitted make daily sick calls to on-site medical staff.  Edwards ¶ 12.D.iii.  If detainees or inmates complain of illness, medical staff are instructed to evaluate them.  Edwards ¶ 14.  Those who present with COVID-19 symptoms are provided a "surgical mask." *Id.*

As for detainees and inmates with "health conditions identified by the CDC as putting them at a high risk of developing serious illness or death from COVID-19", HCCC has "[e]stablished a protocol" that includes "daily monitoring" and "a plan to remove [them] from the rest of the population if determined to be necessary" by the Facility's "Medical Department." *Id.* ¶ 12.G.iv.  As of May 11, 2020, these inmates are also are "housed by themselves" and "[t]he correctional officers who work with those inmates and detainees are using full PPE including suits, N95 masks

and gloves." *Id.* ¶ 25.  Additionally, the entire inmate and detainee population has been provided surgical masks.[37] *Id.*

HCCC uses the multipurpose Universal Transport Medium ("UTM-RT") to test detainees and inmates for COVID-19, and test results are returned in approximately 72 hours.  *Id.* ¶ 15. According to Warden Edwards, HCCC has "a liberal  testing  policy", *see id.*, but the protocol "to test any detainees or inmates who require testing for COVID-19[,]", *id*, is circular,  and it is unclear when or why a detainee would "require testing."  According to the protocol, testing is reserved for those with symptoms of COVID-19 and there is no plan to test the entire detainee population in light of the quarantine protocol.  *Id.* ¶ 24.

As of May 11, 2020, 104 inmates and detainees have been tested for COVID-19; of that total number 61 tested negative and 43 tested positive for COVID-19.  *Id.* ¶ 23.  Warden Edwards reports that 41 of the 43 have fully recovered and none "had to be hospitalized."  *Id.*  As of May 10, 2020, 16 ICE detainees have tested positive for COVID-19.  *Id.* ¶ 20.A.  Since the prior week, three detainees and no county and federal inmates are newly positive for COVID-19.  *Id.*

In contrast to its protocol for testing detainees and inmates, HCCC recently mandated that all 350 law enforcement officers be tested for COVID-19.  *Id.*  ¶ 22.  As of May 11, 2020, 237 law enforcement officers have been tested for COVID-19.  *Id.*  140 law enforcement officers have tested negative, and 97 law enforcement officers have tested positive; of the 97 testing positive, 84 have recovered and returned to duty.  *Id.*

---

[37] All staff ha[ve] Personal Protective Equipment ("PPE"), including N-95 masks, gloves, and eyes protection. Nurses also have coveralls or gowns."  *Id.* ¶ 13.C.

Warden Edwards also reports that 97 HCCC staff members have tested positive for COVID-19 since the outbreak began with three new positive tests for staff in the last week.[38]  *Id.* ¶ 20.C.  All staff who were in proximity of those testing positive were sent home to self-quarantine for the recommended 14-day time period.  *Id.*  Two members of the HCCC correctional staff, the former facilities commissary director, and two nurses who worked at HCCC have died from complications from COVID-19.  *Id.* ¶ 21.

### 9.  Petitioners' Evidence Regarding the Conditions at HCCC

In contrast to the stated protocols, the declarations of former detainees at Hudson County Jail report deteriorating conditions, including sick detainees, a lack of adequate medical attention, dirty living areas, and inability to socially distance.  *See* ECF Nos. 21-1, 21-2, 21-3, 21-4 (Declarations of Rafael Lituma, Jorge Sanchez, Vasif Basank, Derron Bentick, and Leandro Pena); *see also* ECF No. 21-5 (Declaration of Andrea Saenz). Furthermore, they assert that neither ICE nor Hudson County Jail staff provided any education to detained individuals about the COVID-19 pandemic or best practices, which led to fear and confusion, Lituma Decl. ¶¶ 3-6; Sanchez Decl. ¶ 5; Basank Decl. ¶ 3; Bentick Decl. ¶¶ 4-5; Pena Decl. ¶ 3, and a hunger a strike.  Saenz Decl. ¶ 10; Sanchez Decl. ¶ 10-12; Pena Decl. ¶ 10.

Detainees report that HCCC does not provide access to hand sanitizer and detainees receive insufficient soap and toilet paper and could not receive additional supplies.  Lituma Decl. ¶ 10; *see also* Sanchez Decl. ¶ 5; Basank ¶¶ 11, 20; Pena Decl. ¶ 12 ("I would run out of soap after 5 or 6 days of use when officers were only distributing soap about  once every two weeks. . . ."). Detainees also have insufficient supplies to clean their cells. Pena Decl. ¶ 8 ("The only materials we could access to clean our cells were a mop with some cleaning solution and window cleaner.

---

[38] It is unclear how 97 law enforcement officers and 97 staff members could test positive for COVID-19 or if these are separate categories.

There was one mop in the housing unit that we all had to share. I never saw anyone wipe down the mop handle, and the only thing we could have wiped it with was the window cleaner.")

Detainees report that social distancing is neither possible nor enforced in communal areas, Lituma Decl. ¶ 6-7, 17; Basank Decl. ¶ 8, or in small, two-person cells. Lituma Decl. ¶ 6; Sanchez Decl. ¶ 4; Bentick Decl. ¶ 7 ("We were kept in close quarters with each other, so it was impossible for me to keep a safe distance or avoid touching the same surfaces as my cellmate. We were never provided with antibacterial or disinfectant hand soap. The only soap we had was bar soap—and my sick cellmate would use my bar of soap that I kept by the sink in our cell. My cellmate would also cough and sneeze onto the glass pane on our cell door. There was no way to sanitize it after the fact. This made things difficult when I needed to approach the door to get an officer's attention, because I was afraid of getting close to the infected surface."). Each detainee shares a toilet inside his cell with his cellmate, and the facility has reportedly placed restrictions on flushing the toilets, causing waste to build up and cells to become foul-smelling and claustrophobic. *See* Saenz Decl. ¶ 8; Pena Decl. ¶ 7.

Despite the increased sanitation efforts, detainees also report that frequently touched common areas and surfaces, such as tables, microwaves, and phones, are not cleaned. Lituma. Decl. ¶ 9; Sanchez Decl. ¶ 4, 14; Basank Decl. ¶¶ 10, 16; Bentick Decl. ¶ 29; Pena Decl. ¶ 5; Saenz Decl. ¶ 6; *see also* Saenz Decl. ¶ 12 (to make a "sick call," or check their commissary balance, view messages from family or make grievances, detainees must use a tablet (or "kiosk") installed in the wall of the unit which are heavily used and these tablets are not regularly cleaned, and there are not cleaning materials available near the tablets.)

Detainees also report that they were initially not given masks or gloves Lituma Decl. ¶ 10; Sanchez Decl. ¶¶ 5-6. HCCC later provided each detainee only a single mask and pair of gloves

to keep and reuse.  *See* Saenz Decl. at ¶ 14 (As of "the week of April 6," detainees reported that the HCCC had provided them each with "a single-use mask … which detainees are expected to keep and reuse."); Pena Decl. ¶ 18 ("It wasn't until around the beginning of April that we received any personal protective equipment, and only when we were going outside of our housing unit. I was given one mask and a pair of gloves, and I had to continue using the same mask for over two weeks until I was released.")

Despite the isolation protocols, detainees also report that they are surrounded by symptomatic individuals with fevers and coughs who wait days to see a doctor or are returned to the general population after a brief medical visit and are not isolated.  Sanchez Decl. ¶¶ 7, 9; Basank Decl. ¶ 5 ("There were rumors that people in the jail were starting to get COVID-19.  One of the people in my dorm was coughing a lot.  One night around 2am, they took him away.  We thought maybe he was deported, but then a few days later he came back.  People around me said he was taken to a clinic because of the coughing, and they all thought he had COVID-19."); Bentick Decl. ¶ 10-11 ("Since I began feeling sick, I made numerous requests to see a doctor but they were consistently ignored. At some point, I started asking a Corrections Officer if I could speak to a doctor at least once every day. They would just tell me that they would pass the message on, but no one ever followed up. I felt I was disposable."); Sanchez Decl. ¶ 9 (reporting that detainees had to "seem like [they] were dying" to be taken to the hospital); Saenz Decl. at ¶ 11 ("As of the week of April 13, multiple people detained at Hudson County Jail reported that jail staff remains extremely slow or unresponsive to medical attention. One client reported that medical staff was more responsive to medical calls before the pandemic, but now medical calls go ignored for days or even a week.") *see also* Saenz Decl. at ¶¶ 11-12 ("On April 15, another client reported that he put in a sick call "about a week ago" and still hasn't received a response.  As of the week

of April 13, multiple people detained at Hudson County Jail reported that jail staff remains extremely slow or unresponsive to medical attention."); Pena Decl. ¶ 16 ("Even when I was making sick calls about once every two days, it still took weeks to receive medical attention.")

In support of the Petition, Petitioners have also provided the Declaration of Gregg S. Gonsalves, an Epidemiologist at the Yale School of Medicine and School of Public Health, who, among other positions, has worked for over 30 years on global health issues and written and published extensively on topics addressing infectious diseases among people involved in the criminal justice system. ECF No. 21-6, Gonsalves Decl. ¶ 1. Dr. Gonsalves was specifically asked to comment on jail conditions during and preparedness for the COVID- 19 pandemic. *Id.* ¶ 3 and concludes that HCCC remains "dangerously under-equipped and ill prepared to manage the current COVID-19 outbreak within these facilities and to prevent further community spread." *Id.* ¶ 44.

## II.   STANDARD OF REVIEW

Under 28 U.S.C. § 2241, a district court may exercise jurisdiction over a habeas petition when the petitioner is in custody and alleges that his custody violates the constitution, laws, or treaties of the United States. 28 U.S.C. § 2241(c); *Maleng v. Cook*, 490 U.S. 488, 490 (1989). A petitioner may seek Section 2241 relief only in the district in which he is in custody. *United States v. Figueroa*, 349 F. App'x 727, 730 (3d Cir. 2009). This Court has jurisdiction over Petitioners' claims as they are detained within this district and allege that their continued detention violates the Due Process Clause of the Fifth and Fourteenth Amendments.

Petitioners have filed a TRO seeking their immediate release from detention, which the Court construes as a request for a preliminary injunction. *See Hope v. Warden York County Prison*, 2020 WL 1922372, at *2-4 (3d Cir. Apr. 21, 2020). Motions for temporary and preliminary injunctive relief are governed by a four-factor test. The movant must, as a threshold matter,

establish the two "most critical" factors: likelihood of success on the merits and irreparable harm. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). If these "gateway factors" are satisfied, the Court considers the third and fourth factors, which aim to balance the equities by examining the potential for harm to others if relief is granted and whether the public interest favors injunctive relief. *Id.* at 176, 179. "If a plaintiff meets the first two requirements, the District Court determines in its sound discretion whether all four factors, taken together, balance in favor of granting the relief sought." *Fulton v. City of Philadelphia*, 922 F.3d 140, 152 (3d Cir. 2019).

The Court also considers whether Petitioners have established extraordinary circumstances justifying their release. *See Lucas v. Hadden*, 790 F.2d 365 (3d Cir. 1986); *Landin v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) (indicating that a court may only grant release pending a disposition of federal habeas claims when the petitioner has raised "substantial constitutional claims upon which he has a high probability of success, and . . . when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective") (citation omitted)); *see also In re Soule's*, 688 F. App'x 134, 135-36 (3d Cir. 2017).

## III.   DISCUSSION

Courts in this district and in neighboring districts have, in the last two months released medically vulnerable ICE detainees; those decision include one from this Court releasing medically vulnerable petitioners at HCCC. *See, e.g., Cristian A.R. v. Decker*, No. 20-3600, ECF No. 26 (D.N.J. April 12, 2020) (finding that the protocols in place at HCCC and Bergen County Jail did not adequately protect medically vulnerable detainees and holding that continued detention such detainees during COVID-19 pandemic amounted to punishment under the Fifth Amendment); *see also Rafael L.O.  v. Tsoukaris*, No. 20-3481, ECF No. 25 (D.N.J. April 9, 2020); *Thakker v. Doll*, No. 20-480, 2020 WL 1671563  (M.D. Pa. Mar. 31, 2020); *Jeferson V. G. v. Decker*, No. 20-

3644, 2020 WL 1873018 (D.N.J. Apr. 15, 2020); *Marvin A. G. v. Decker*, No. 20-1689 (D.N.J. Apr. 14, 2020); *Kevin M.A. v. Decker*, No. 20-4593, 2020 WL 2092791, at \*10 (D.N.J. May 1, 2020). The Court now analyzes whether Petitioners in this action can satisfy the standards for a preliminary injunction and have asserted extraordinary circumstances needed to warrant release from habeas detention.

### A.  The Gateway Factors

Petitioners assert that their conditions of confinement amount to punishment under the Due Process Clause and that Respondents' failures to address their medical needs during the COVID-19 outbreak amount to deliberate indifference to their serious medical needs.[39]

Recent decisions in this District have established the legal backdrop governing conditions of confinement claims brought by civil detainees. *See, e.g., Cristian A.R.*, No. 20-3600; *Rafael L.O.*, 2020 WL 1808843. Civil detainees are entitled to due process and may bring conditions of confinement claims under the Due Process Clause of the Fifth (or Fourteenth) Amendment as opposed to the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979); E.D. v. Sharkey, 928 F.3d 299, 306-07 (3d Cir. 2019). The Fifth and Fourteenth Amendments protect civil detainees like Petitioner from any—*not just "cruel and unusual"*—punishment. *See Hubbard v. Taylor*, 399 F.3d 150, 166-67 (3d Cir. 2005).

To determine whether Petitioner's conditions of confinement constitute punishment, the Court asks whether the challenged conditions are reasonably related to a legitimate governmental objective, and if they are not, it may infer "'that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees qua detainees.'" *E.D. v. Sharkey*, 928 F.3d 299 307 (3d Cir. 2019) (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir.

---

[39] The Petitioners do not argue that the immigration detention statutes are unconstitutional as applied to them, and the Court does not address this argument, which misconstrues the basis of Petitioner's claims for relief.

2008)).  A condition or deprivation amounts to punishment if there is "an expressed intent to punish on the part of detention facility officials"; no "alternative purpose to which [the condition or deprivation] may rationally be connected is assignable for it"; or the condition or deprivation is "excessive in relation to the alternative purpose assigned [to it]." *See Bell*, 441 U.S. at 538 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)). The Court considers "the totality of the circumstances within an institution" to determine whether given conditions constitute punishment. *Hubbard*, 399 F.3d at 160 (internal quotation marks and citation omitted). Civil detainees, like inmates, may be entitled to relief if they prove threats to personal safety from exposure to serious contagious diseases. *See Cristian A.R.*, No. 20-3600, slip. op. at 19 (citing *Helling v. McKinney*, 509 U.S. 25, 32 (1993)).

Respondents assert that HCCC has sufficiently implemented recommendations from the CDC to combat the spread of COVID-19 at the facility.  Answer at 9.  In *Cristian A.R.*, the Court analyzed the conditions of confinement at HCCC during the COVID-19 pandemic and concluded that HCCC failed to protect the most vulnerable detainees in its care.  *See* 2020 WL 2092616, at *10-12.  Here, the Court finds that the improvements over the last month-and-a-half, including providing a single reusable mask and pair of gloves to each detainee, and housing high risk detainees "by themselves," *see* Edwards Decl. ¶ 25, are laudable but insufficient to change the Court's analysis.  This is especially true because Warden Edwards acknowledges in his most recent Declaration that HCCC is only testing symptomatic detainees test for COVID-19 and makes it clear that HCCC has no plans to test the entire detainee population.  *See id.* ¶¶ 15, 24.

The Declarations from individuals detained at HCCC during the COVID-19 crisis also highlight serious gaps in HCCC's remedial measures as the virus spreads at HCCC and also shows a disconnect between the stated protocols and the detainees' lived experiences.  *See* Lituma,

Sanchez, Basank, Bentick, and Pena Declarations; *see also* Saenz Decl.).  As detailed in Section E of this Opinion, the declarations of former detainees at Hudson County Jail report deteriorating conditions, dirty living areas, inability to socially distance, sick detainees who are not isolated, a lack of adequate medical attention, as well as a failure by HCCC and ICE to educate detainees about the spread of the virus and the best means to protect themselves.  *See supra* Section E.

Respondents next argue that Petitioners are unable to establish a likelihood of success on the merits (or irreparable harm) because their medical conditions do not put them sufficiently at risk of complications from COVID-19.  Answer at 10.  They cite to *Ousman D. v. Decker*, No. 20-2292, 2020 U.S. Dist. LEXIS 63976, at \*27 (D.N.J. Apr. 13, 2020) and *Francisco M. v. Decker*, 20-cv-2176 (D.N.J. Mar. 25, 2020), which held that that injunctive relief in the form of immediate release is not mandated where an immigration detainee is not "part of the vulnerable population that is predisposed to suffering the most severe effects of COVID-19" and invite this Court to follow *Barbecho v. Decker*, No. 20-CV-2821, 2020 WL 1876328 (S.D.N.Y. Apr. 15, 2020) (denying immediate release to four petitioners because their chronic medical conditions were not included in the CDC Risk Factors for COVID-19).

The Court declines the invitation to find that an individual detainee must have a CDC Risk Factor for COVID-19 to warrant release from confinement.  In *Reyes P. v. Edwards*, No. 20-3686, 2020 WL 2474423, at \*7 (D.N.J. May 13, 2020), this Court also denied immediate release to a Petitioner who appeared to have no chronic underlying health conditions, and cited to the CDC Risk Factors as examples.  *Id.* at n.7.  The Court noted, however, that it made "no determination about the types of conditions that could support a claim for relief."[40]  *Id.*

---

[40] Indeed, this Court recently held that a petitioner with schizophrenia-spectrum disorder established a likelihood of success on his claim that his detention amounted to punishment under the Due Process Clause claim in light of his conditions of confinement and his particular mental health vulnerabilities.  *See Jose B.R. v. Tsoukaris*, No. 20-3347,

Although some of the Petitioners in this action have medical and mental health conditions that are not included in the CDC Risk Factors for COVID-19, the Court finds that each Petitioner has provided sufficient evidence and support for his particular vulnerabilities.  Due to their conditions of confinement at HCCC where they are unable to practice social distancing or adequate hygiene and their particular medical vulnerabilities, the Petitioners in this action have shown a likelihood of success on the merits of their constitutional claim that their detention at HCCC during the COVID-19 pandemic amounts to punishment.[41]  To the extent a particular Petitioner has a medical or mental health condition that is a less established comorbidity for COVID-19, the Court takes that into account below when it balances all the factors required to obtain a preliminary injunction.

To be entitled to a preliminary injunction, a movant must also establish that he or she is "more likely than not" to suffer irreparable harm absent the requested relief.  *See Reilly*, 858 F.3d at 179.  Here, as the Court found with respect to the petitioners in *Cristian A.R.*, Petitioners in this action have likewise shown a likelihood of irreparable harm due to their medical vulnerabilities and the conditions of confinement at HCCC.  2020 WL 2092616, at *12.  The Court rejects Respondents' argument that Petitioners' likelihood of contracting COVID-19 is speculative.  As the Supreme Court observed in *Helling v. McKinney*, 509 U.S. 25 (1993), "it would be odd to deny

---

2020 WL 2744586, at *12 (D.N.J. May 27, 2020); *see also Durel B. v. Decker*, No. 20-3430, 2020 WL 1922140 (D.N.J. Apr. 21, 2020) (releasing petitioner with schizoaffective disorder and posttraumatic stress disorder).

[41] Civil detainees also have a constitutional right to adequate medical care, including the creation of policies ensuring adequate health care, and such claims are governed by the deliberate indifference standard.  *See Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 585 (3d Cir. 2003) (holding that a reasonable jury could conclude that a governmental entity's failure to establish a policy to address inmates' immediate medication needs constituted deliberate indifference); *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Detention Ctr.*, 372 F.3d 572, 585 (3d Cir. 2004) (detention center's lack of policies to address the physical and mental health needs of residents caused the plaintiff harm).  Because the Court finds that Petitioners are likely to succeed on their claim that their conditions amount to punishment and because deliberate indifference has a more stringent *mens rea* requirement, it need not reach the deliberate indifference claim.  In this regard, the Court notes that it would balance the equities and the public interest in the same manner for both types of claims.

an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them." *Id.* at 33 (noting that "the Courts of Appeals have plainly recognized that a remedy for unsafe conditions need not await a tragic event").

### B.  Balancing of the Equities and the Public Interest

That brings the Court to the balancing of the equities and the public interest, which is the nub of the decision in this case.  "Before granting an injunction, a district court must balance the relative harm to the parties, i.e., the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued." *Novartis*, 290 F.3d at 596 (internal citation omitted).  Respondents argue that the relief requested – immediate release – is a threat to public safety in light of Petitioner's serious criminal histories.  Answer at 49.  Petitioners contend that the balance of equities and public interest weigh heavily in their favor and argue that their criminal histories do not justify their continued civil detention in unsafe conditions. Petitioners' Reply at 25.  They further assert that "the potential harm to Respondents is limited" and merely "fiscal and administrative" and that "[n]o public interest is served by permitting the government to detain vulnerable individuals who are at heightened risk of severe illness or death, like Petitioners, should they be exposed to COVID-19 in a jail setting."  TRO Motion at 20.

In *Cristian A.R.*, the Court found the potential of injury to petitioners to be high and also found that the public interest supported the release of Petitioners before they contract COVID-19 to preserve critical medical resources and prevent further stress on the states' and country's already overburdened healthcare systems.  *See* 2020 WL 2092616, at *13 (citing *Rafael L.O.*, 2020 WL

1808843, at *9).  The same is true here, albeit to a lesser extent, as hospitalizations in New Jersey have declined in the weeks since the Court issued its decision in *Cristian A.R.*[42]

As the Court recognized in *Cristian A.R.*, "Respondents also have a legitimate interest in ensuring that Petitioners do not flee and in protecting the public." *Id.*; *see also Rafael L.O.* 2020 WL 1808843 (explaining that release is warranted where the "legitimate interests of ICE (in particular, flight risk and dangerousness) can be accommodated by the conditions of release."); *Thakker v. Doll*, 2020 WL 2025384, at *8 (M.D. Pa. Apr. 27, 2020) ("*Thakker II*") (explaining that each petitioner has "an unique set of circumstances that [the court] must balance against the public interest" and identifying petitioners' "failure to appear at future immigration proceedings, or to commit crimes while released" as factors weighing in favor of detention).  Indeed, in *Cristian A.R.*, the Court balanced the equities and considered the individual criminal histories of each Petitioner in determining whether there were conditions of release that could ensure the public's safety and gave great weight to the fact that the Petitioners were "each discretionally detained by ICE under 8 U.S.C. § 1226(a)", had "no pending charges, and all have significant ties to this country such that they can be safely released on reasonable conditions of supervision."  2020 WL 2092616, at *13.  For those with serious criminal histories, the Court also imposed "the most stringent conditions of release, including electronic monitoring." [43]  *Id.*

---

[42]*See N.J. coronavirus deaths increase to 11,970 with 162,530 total cases. Hospitalizations fall below 2,000 for 1st time in months,* NJ.com (Jun. 4, 2020), https://www.nj.com/coronavirus/2020/06/nj-coronavirus-deaths-increase-to-11970-with-162530-total-cases-hospitalizations-fall-below-2000-for-1st-time-in-months.html,.

[43] In analyzing the criminal histories of each petitioner, the Court explained that Alvaro N.M., who had the most serious offenses, was last arrested for a felony twenty-eight years ago, and thus this crime was so temporally distant that it did not subject him to mandatory immigration detention. *See id.*  Although Cristian A.R. was more recently charged with serious crimes, the Court explained that he had pleaded guilty to attempted endangering the welfare of a child, a misdemeanor under state law, for which he received a one-year conditional discharge sentence and no term of incarceration.  *Id.*

In balancing the equities and the public interest, other courts have considered violent or otherwise serious or persistent criminal conduct as factors that support denying release from detention. Judge Jones in *Thakker II*, identified violent crime as a factor that weighs heavily in favor of continued (or return to) detention. *See* 2020 WL 2025384, *9 ("Here, Petitioner has been convicted of a violent crime: the assault of his wife. . . . Conviction of a violent crime weighs heavily in favor of returning Petitioner to detention."). Similarly, in *Romeo S.K. v. Tsoukaris*, No. 20-5512, 2020 WL 2537647, at *7 (D.N.J., 2020), Judge Vasquez recognized that a petitioner, who had diabetes and hypertension, was vulnerable to COVID-19 complications, but concluded that there were no adequate conditions of relief that could satisfy the government's legitimate interests due to petitioner's criminal history involving recent convictions for separate incidents, coupled with his history of dishonesty with immigration officials and ICE officers. *Id.* These factors, "tip[ped] the balance in favor of the government." *Id.; see also Reyes P.*, 2020 WL 2474423, at *7 n.8 (discussing the balancing of the equities and the public interest and finding that petitioner's outstanding criminal charges for sexual abuse in the first degree involving sexual contact with a child was relevant to that analysis).

With these principles in mind, the Court now balances the equities and public interest and also determines in its sound discretion whether all four factors, taken together, balance in favor of granting the relief sought."[44] *See Fulton*, 922 at 152.

Thierry B. was arraigned on serious child sexual offenses in New York on November 20, 2019, and is alleged to have engaged a young child to perform oral sex on him. *See* Ex 1 at 15-

---

[44] In this case, the relief sought is immediate release from immigration detention. Petitioners also state in passing that the Court could conduct individual bond hearings as an alternative to release, but they have not provided a legal basis for conducting such bond hearings or explained how conducting a bond hearing would alter the analysis. There is a panoply of other forms of injunctive and declaratory relief for unconstitutional conditions of confinement, and the Court's determination that release is not appropriate relief as to certain Petitioners does not foreclose them from seeking other forms of relief, as appropriate.

22.   He has provided no evidence that these charges have been dismissed or substantially downgraded.  The Court acknowledges that Petitioner has significant ties to the United States, and is a father who has lived in the United States since 2010.  Am Petition ¶ 6.  The Court also recognizes that he suffers from chronic hypertension, which increases his risk of complications were he to contract COVID-19.  *See, supra,* Section I.C.  The Court nevertheless finds that there are no adequate conditions of release that will ensure the public's safety due to the serious pending charges against him and also finds that the overall balancing of all four factors weighs against release from detention while these serious charges are pending.

On October 30, 2017, Michael C. was convicted of Criminal Possession of a Controlled Substance in the 4th Degree, under N.Y. Penal Law § 220.09(1) (Cocaine) and Attempted Criminal Possession of a Weapon in the 2nd Degree, under N.Y. Penal Law § 110-265.03(1B) (handgun) and was sentenced to one-year in prison.  Mascia Decl. ¶ 4(b); Ex. 2 at 4, 5-12.  These recent convictions are serious, and the Court is troubled by the number of guns and amount of ammunition recovered from his residence,  *see* Ex. 2 at 13-14, which Petitioner has not denied or explained. The Court also considers Petitioner's LPR status and his significant ties to the United States, as a lawful permanent resident and father of three U.S. citizen children who has lived in New York since 1996.  Am. Petition ¶ 7.  The Court further notes that his medical conditions – obesity, smoking, and methadone treatment – are less established comorbidities for COVID-19. The Court finds that there are no adequate conditions that can ensure the public's safety in light of these recent convictions and also finds that the balancing of all four factors tips in favor of denying release from detention.

Amr A. E. is a father of three children who came to the United States from Egypt on a tourist visa nearly 20 years ago.  Am. Petition ¶ 8.  He has several convictions, which are

temporally distant.  On September 4, 2019, however, he was arrested for Assault in the 3rd Degree, under N.Y. Penal Law § 120.00(1) and Endangering the Welfare of a Child, under N.Y. Penal Law § 260.10(1).  Mascia Decl. ¶ 4(c), and on September 25, 2019, the charges for assault and endangering the welfare of a child were dismissed, and he pled guilty to the less serious charge of disorderly conduct under N.Y. Penal Law § 240.20(7).  *Id.*  He also suffers from severe obesity, a CDC Risk Factor for COVID-19.  *See, supra,* Section I.C.  The Court finds that it has insufficient information about his criminal convictions, and will reserve judgment and require Amr. A.E. to provide more information about his criminal history, including the underlying factual basis for his convictions, as well as information regarding his ability to voluntarily depart to Egypt.

On December 19, 2018, Jose L.H. was convicted on two counts of assault in the 2nd degree: intent to cause physical injury with weapon/instrument under N.Y. Penal Law § 120.05(2), and two counts of endangering the welfare of a child under N.Y. Penal Law § 260.10(1).  Mascia Decl. ¶ 4(d).  He was sentenced to 5 years of probation on the assault charges and three years of probation on the endangering charges, and his juvenile victims each received an eight-year order of protection.  *Id.*, Ex. 4 at 18.  The Court acknowledges that he is a single father to two U.S. citizen children who has lived in the United States since he was a teenager and has consistently maintained his Temporary Protected Status from El Salvador until he was placed into removal proceedings.  Am. Petition ¶ 9.  The Court also acknowledges Petitioner's vulnerabilities to complications from COVID-19 in light of his latent T.B., severe psoriasis, and anxiety.  *See supra* Section I.C.  Nevertheless, given his recent serious convictions for assaulting two children and the lack of information regarding his potential rehabilitation, this Court finds that there are no adequate conditions of release that can ensure the public's safety.  The Court also finds that the balancing of all four factors weighs against his release from detention.

On April 15, 2019, Nathaniel A.L. was arrested for Robbery in the 2nd Degree Causes Physical Injury, in violation of N.Y. Penal Law § 160.10(2A); Strangulation in the 1st Degree Obstructing Breath/Blood Circulation, in violation of N.Y. Penal Law § 121.13; and Assault in the 3rd Degree in violation of N.Y. Penal Law § 120.00.  Mascia Decl. ¶ 4(e); Ex. 5 at 4.  Petitioner has provided no evidence showing that these charges have been dismissed or substantially downgraded.  The Court has also considered Petitioner's ties to the United States and his asthma and history of smoking, which may increase his risk of complications if he were to contract COVID-19.  *See, supra,* Section I.C. Nevertheless, the Court finds that there are no adequate conditions of release that can ensure the public's safety due to the violent nature of the pending charges against him.  The Court's balancing of all four factors weighs against granting his release.

On July 17, 2019, Naishel S. was convicted of Attempted Burglary in the 2nd Degree, in violation of N.Y. Penal Law § 110-140.25(2). Mascia Decl. ¶ 4(f); Ex. 6 at 26, 27-35, stemming from his participation in a series of attempted burglaries in Queens with several defendants. *See* Ex. 6 at 31-36.  The Court also considers that he had recent collapse and received medical care because he had trouble breathing, Am. Petition  ¶ 11, and he was recently diagnosed with PTSD, as a result of a beating by correctional officers at Riker Island in 2018.  *See* Excerpted Medical Records at 36-41.   The  Court  notes,  however,  that  these  conditions  are  less  established comorbidities for COVID-19.  The Court finds that it is unable to fashion conditions of release that ensure the public's safety in light of Petitioner's serious convictions and finds that the balancing of all four factors weighs in favor of denying release from detention.

Finally, Oscar J.P.'s most serious conviction occurred a year ago on March 18, 2019.  He pleaded guilty to one count of Criminal Obstruction of Breathing or Blood Circulation Apply Pressure, under N.Y. Penal Law § 121.11(a) and Endangering the Welfare of a Child, under N.Y.

Penal Law § 260.10(1).  Mascia Decl. ¶ 4(g); Ex. 7 at 13-15, 20-21.  He has not provided any information about the circumstances of this offense or his potential rehabilitation.  The Court also considers that he has significant ties to the United States, as the the father of five U.S citizen children, and has lived in the United State for approximately 15 years.  Am. Pet. ¶ 12.  Finally, the Court considers that Oscar J.P.'s medical conditions – a history of smoking, recent chest pains and heart palpitations, and recent bloodwork showing abnormal liver function.  *See, supra,* Section I.C. In this regard, the Court notes that his conditions are less established comorbidities for COVID-19.  The Court finds that it is unable to fashion conditions of release that ensure the public's safety in light of Oscar J.P.'s recent conviction for a violent crime, and the balancing of all four factors weigh in favor of denying release from detention.

Having failed to meet the test for a preliminary injunction,  Petitioners Thierry B.,  Michael C.,  Jose L.H.,  Nathaniel L.,  Naishel S.,  and Oscar J.P. also fail to meet the more stringent "extraordinary circumstances" test for release pending the final adjudication of their habeas petition.

## IV.    CONCLUSION

Having found that the balancing of all four preliminary injunction factors weighs in favor of denying release of six of the seven Petitioners, the Court denies the preliminary injunction without prejudice as Thierry B.,  Michael C., Jose L.H., Nathaniel L., Naishel S., and Oscar J.P, and also denies habeas release based on extraordinary circumstances.  The denial of relief is without prejudice to changed circumstances at HCCC and/or their individual circumstances.  The Court will reserve judgment as to Amr. A.E. and request further information regarding his criminal history and his ability to voluntarily depart to Egypt.  At this time, the Court will sever this matter into individual cases. The Court will provide Petitioner Amr. A.E. with 10 days to submit

additional information as described in the Order accompanying this Opinion.  The Court will provide all other Petitioners in this action with 30 days in which to file individual amended petitions in the newly-severed cases prior to closing those matters.  An appropriate Order follows.


Dated:  June 10, 2020                          */s Madeline Cox Arleo*_____
                                               **Hon. Madeline Cox Arleo**
                                               **UNITED STATES DISTRICT JUDGE**